**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　　Plaintiff,<br>v.<br>Iris Rodriguez<br>　　　　　Defendant. | No. CR-17-01301-TUC-JAS (BGM)<br><br>**REPORT AND RECOMMENDATION** |

Currently pending before the Court is Defendant Iris Rodriguez's Motion to Suppress Evidence (Doc. 29). The Government has filed its Response (Doc. 37), and no reply was filed.

Defendant is charged with one count of knowingly and intentionally combining, conspiring, confederating and agreeing together and with other persons known and unknown to possess with intent to distribute five (5) grams or more of methamphetamine, or fifty (50) grams or more of a mixture or substance containing a detectable amount of methamphetamine (approximately 140 grams of methamphetamine), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii), and with one count of knowingly and intentionally possessing with intent to distribute five (5) grams or more of methamphetamine, or fifty (50) grams or more of a mixture or substance containing a detectable amount of methamphetamine (approximately 140 grams of methamphetamine), a Schedule II controlled substance; in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii). Indictment (Doc. 8).

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for

an evidentiary hearing and a report and recommendation. An evidentiary hearing was held before Magistrate Judge Macdonald on May 1, 2018. Minute Entry 5/1/2018 (Doc. 38). On May 8, 2018, the Court received the final transcript, and the motion is now ripe for adjudication. The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion.

## I. FACTUAL BACKGROUND

### A. *The I-19 Checkpoint*

Border Patrol Agent Vanessa Salcedo described the I-19 Border Patrol Checkpoint in Amado, Arizona. Hr'g Tr. 5/1/2018 (Doc. 42) at 7:7–11:15. Agent Salcedo has worked for Border Patrol for three (3) years, and has worked at the I-19 checkpoint in Amado, Arizona for two (2) years. *Id*. at 6:24–7:1. Agent Salcedo testified that she is stationed at the checkpoint full time, approximately five (5) days per week, or fifty (50) hours per week. *Id*. at 7:2–6. Agent Salcedo explained the general procedure at the I-19 checkpoint, where vehicles enter the primary inspection area and are initially met by a primary inspection agent. *Id*. at 8:1–9:1. Agent Salcedo described this initial contact as an immigration inspection, in which the agent conducts a small investigation to determine the citizenship or immigration status of the driver or occupant(s). *Id*. at 8:18–9:9, 38:5–9. Agent Salcedo testified that there was not a specific script, but that she will sometimes ask for identification. Hr'g Tr. 5/1/2018 (Doc. 42) at 9:10–14. Agent Salcedo further testified that there is not a requirement for a specific form of identification, and that the immigration inspection concludes "when the agent is satisfied with the citizenship status of the person they're encountering[.]" *Id*. at 9:15–10:8. Agent Salcedo explained that, for her, this means that she has performed her due diligence, including running a records check, and if after looking at an individual's identification, she believes that the person is being truthful. *Id*. at 10:3–8.

Agent Salcedo also described the general procedure for shuttle buses or vans entering the immigration checkpoint. *Id*. at 10:9–13:19. Agent Salcedo testified that all

shuttle buses and vans are sent to the secondary inspection area. *Id*. at 10:9–19, 11:6–10. Agent Salcedo explained that this procedure is to provide the agents more time, given the increased number of occupants in those vehicles. Hr'g Tr. 5/1/2018 (Doc. 42) at 10:20–24. Agent Salcedo estimated that fifty (50) shuttle vehicles travel through the checkpoint each day. *Id.* 10:25–11:4, 11:11–15. Agent Salcedo further testified that subsequent to an immigration check, she has arrested individuals for illegal entry and/or attempting to smuggle narcotics in the United States on their person. *Id.* at 11:16–12:10. Agent Salcedo testified that when attempting to assess whether someone might be carrying narcotics on their person or entering illigally, she looks for really baggy clothing, and someone who is shying away from her, avoiding eye contact, or moving away. *Id.* at 12:11–19, 40:1–5, 45:8–15. Conversely, Agent Salcedo also testified that on the opposite end of the spectrum, someone who is super happy, nervous, very loud, talking fast, and "all in [her] face" is also suspicious. *Id.* at 12:11–19, 45:16–46:1.

### B. *The Stop*

On July 28, 2017, at approximately 5:25 p.m., Agent Salcedo was stationed at the I-19 checkpoint, working in the secondary inspection area. Hr'g Tr. 5/1/2018 (Doc. 42) at 13:24–14:19. Agent Salcedo testified that a Sonoran shuttle entered the secondary inspection area. *Id.* at 14:23–15:1. Agent Salcedo did not remember exactly how many agents were in secondary at that time; however, she remembered at least herself and one other agent. *Id.* at 15:2–6. Agent Salcedo further testified that she recalled less than twelve (12) shuttle passengers. *Id*. at 15:7–13. Agent Salcedo also testified that she was positioned next to the shuttle, in front of its doors. *Id.* at 15:25–16:8. Agent Salcedo stated that she likes to be in the front in order to observe who is exiting the shuttle, and for officer safety. Hr'g Tr. 5/1/2018 (Doc. 42) at 16:12–16.

Agent Salcedo testified that a female passenger drew her attention when she exited the shuttle, made eye contact, and then "quickly proceeded to move away[.]" *Id*. at 16:17–21. Agent Salcedo testified that she found this behavior suspicious, noting that it was one of the indicators that suggests a person may be involved in criminal activity. *Id*.

- 3 -

at 16:22–17:2, 53:8-19. Agent Salcedo also noted that an individual making eye contact and then walking away from her is very unusual. *Id.* at 52:14–25. Agent Salcedo further testified that she initiated contact with the woman, and identified her as Defendant Iris Rodriguez. *Id*. at 17:3–16.

Agent Salcedo testified that she asked Ms. Rodriguez if she was a United States citizen. Hr'g Tr. 5/1/2018 (Doc. 42) at 17:18–22. Ms. Rodriguez responded affirmatively, providing Agent Salcedo an Arizona driver's license; however, Agent Salcedo found that the individual pictured on the driver's license did not appear to be Ms. Rodriguez. *Id.* at 17:13–18:5, 40:24–41:14. Agent Salcedo further testified that she proceeded to ask Ms. Rodriguez for additional identification. *Id*. at 18:6–7. Ms. Rodriguez then provided Agent Salcedo a United States passport card, but again Agent Salcedo found that the individual pictured did not appear to be Ms. Rodriguez. *Id*. at 18:8–20:15, 41:19–42:4. Agent Salcedo also testified that aside from the identification pictures not appearing to be Ms. Rodriguez, the pictures did not look like one another either. *Id*.; *see also* Govt.'s Exhs. "4" & "5." Agent Salcedo testified that this discrepancy led her to believe that Ms. Rodriguez was not a United States citizen, and further investigation was required. Hr'g Tr. 5/1/2018 (Doc. 42) at 20:16–20. Agent Salcedo denied that Ms. Rodriguez showed her any other identification. *Id.* at 43:3–20. Agent Salcedo testified that in light of the apparent discrepancy, she ran a records check—meaning that she called her dispatch with Defendant's name and date of birth for a search for any criminal history, citizenship, and whether there are any reports of official identification having been stolen. *Id.* at 20:21–21:16, 54:6–22.

While Agent Salcedo was waiting for the results of the records check, she continued to question Defendant. *Id*. at 21:23–25. Agent Salcedo testified that she asked Ms. Rodriguez where she was from, and where she was coming from. *Id*. at 22:1–3. Ms. Rodriguez stated that she was from Tucson, and was coming from Nogales, Arizona. Hr'g Tr. 5/1/2018 (Doc. 42) at 22:4–6. Agent Salcedo further testified that Ms. Rodriguez stated that her nineteen (19) year old daughter was living with a roommate in

Nogales, and that she taken her school shopping. *Id.* at 22:7–13. Agent Salcedo testified that she found Ms. Rodriguez's answers odd, because she thought it was odd that Ms. Rodriguez was still school shopping for a daughter who had moved out on her own. *Id.* at 22:23–23:4.

At some point during Agent Salcedo's questioning, Ms. Rodriguez moved away from the agent to sit down. *Id.* at 23:13–19. Agent Salcedo testified that Ms. Rodriguez's demeanor seemed a little nervous, and that she appeared excited, very happy, talking loud and fast, and mixing up her words.[1] *Id.* at 23:20–24:5, 51:25–52:10. Agent Salcedo further testified that based on Ms. Rodriguez's behavior and her training and experience, she suspected that Ms. Rodriguez was involved in criminal activity. *Id.* at 24:4–15. Specifically, Agent Salcedo believed that Ms. Rodriguez was a body carrier. Hr'g Tr. 5/1/2018 (Doc. 42) at 24:4–15. Based on her suspicions, Agent Salcedo asked Ms. Rodriguez if she would consent to a search of her person. *Id.* at 24:16–19, 47:15–19. Agent Salcedo testified that Ms. Rodriguez verbally consented to the search. *Id.* at 24:20–24, 47:23–48:1, 72:12–20. Agent Salcedo further testified that her normal practice is to obtain verbal consent prior to a search. *Id.* at 24:25–25:6. Agent Salcedo estimated that her encounter with Ms. Rodriguez up to this point had lasted approximately forty-five (45) seconds. *Id.* at 26:14–20, 43:21–23, 47:15–19.

Upon Ms. Rodriguez's consent to be searched, they walked to a white shed where Agent Salcido conducted all pat-downs and searches of females. Hr'g Tr. 5/1/2018 (Doc. 42) at 26:23–27:8, 72:21–73:1. Agent Salcedo testified that although she was armed, her weapon remained holstered, and at no time did she place her hand on her firearm or otherwise motion toward it, nor did she restrain Ms. Rodriguez, place her under arrest, or threaten her. *Id.* at 25:11–26:13. Agent Salcedo testified that she and Ms. Rodriguez were the only people in the shed, and Agent Meadz was standing just outside the door. *Id.* at 73:7–10, 74:2–22. Prior to performing the pat down search, Agent Salcedo asked

---

[1] Agent Salcedo explained that "mixing up her words" meant Ms. Rodriguez jumbled the word placement of her sentences. Hr'g Tr. 5/1/2018 (Doc. 42) at 23:24–24:5.

Ms. Rodriguez if she had any weapons or drugs on her person. *Id.* at 30:6–18. Ms. Rodriguez responded that she was not in possession of any weapons or drugs. *Id.* at 30:19–21. Agent Salcedo informed Ms. Rodriguez that she was going to begin the search, and Ms. Rodriguez stated "okay." Hr'g Tr. 5/1/2018 (Doc. 42) at 30:22–31:3.

Agent Salcedo testified that she performed one complete pat-down of Ms. Rodriguez in the manner in which she had been trained. *Id.* at 31:8–22, 54:12–22, 74:23–25. Agent Salcedo estimated that the search took approximately fifteen (15) seconds. *Id.* at 75:1–2. Agent Salcedo further testified that at the outset of the search, Ms. Rodriguez continued to exhibit a good mood. *Id.* at 31:4–7. Agent Salcedo testified that as she conducted the pat-down search, she felt a hard, abnormal bulge under Ms. Rodriguez's left breast area. *Id.* at 31:23–32:5, 75:3–23. Agent Salcedo asked Ms. Rodriguez to "pull out what was in her bra." Hr'g Tr. 5/1/2018 (Doc. 42) at 32:6–7. Ms. Rodriguez stated that it was just the wire to her bra; however, Agent Salcedo did not believe her, because the object did not feel like an underwire. *Id.* at 32:8–13, 77:13–18. Agent Salcedo also testified that she has apprehended approximately twenty (20) other body carriers, and the hard object felt similar to those discovered on other individuals. *Id.* at 75:24–76:21. Agent Salcedo testified that at this point, Ms. Rodriguez was beginning to be upset—she began sweating, shaking, crying, and was becoming hysterical. *Id.* at 32:14–17, 76:22–1. Agent Salcedo further testified that she asked Ms. Rodriguez to pull the item out of her bra a minimum of three (3) times. *Id.* at 32:18–25, 48:19–25, 77:2–5. When Ms. Rodriguez became agitated, and was non-compliant with Agent Salcedo's directions, Agent Mead came to the shed doorway, and instructed Ms. Salcedo to comply with Agent Salcedo's orders, or else he would use his taser. *Id.* at 77:19–78:5. Agent Salcedo also testified that eventually, Ms. Rodriguez did remove the item, and described it as a black, cylindrical, bolt-shaped bundle, wrapped in black electrical tape, and approximately five (5) or six (6) inches in length and two (2) inches wide. Hr'g Tr. 5/1/2018 (Doc. 42) at 33:1–23. Agent Salcedo testified that by this time Ms. Rodriguez was hysterical, crying, and visibly upset. *Id.* at 33:24–34:3. Agent Salcedo further testified that once the bundle

was removed, she took it, placed it under her left foot, and placed Ms. Rodriguez under arrest. *Id.* at 37:11–15. Agent Salcedo estimated that she and Ms. Rodriguez were in the shed for approximately two (2) minutes. *Id.* at 78:11–17. Agent Salcedo also testified that at no time did Ms. Rodriguez revoke her consent to be searched. *Id.* at 37:16–19, 78:18–20. Agent Salcedo was unaware of any health issues that Ms. Rodriguez may have had. Hr'g Tr. 5/1/2018 (Doc. 42) at 79:4–24.

Agent Salcedo further testified that once the bundle was retrieved, agents cut open a section of the bundle to obtain a sample of the substance. *Id.* at 34:22–35:24. After a sample was obtained, the substance was tested with a narcotics identifying kit. *Id*. at 35:11–36:21. Agent Salcedo testified that upon testing, the substance tested positive for characteristics of methamphetamine. *Id*. Agent Salcedo further testified that the bundle weighed approximately 140 grams. *Id.* at 37:4–10.

### *C. Defendant Iris Rodriguez's Testimony*

Defendant Iris Rodriguez is a thirty-five (35) year old female, who has lived in Arizona since she was eleven (11) years old. Hr'g Tr. 5/1/2018 (Doc. 42) at 57:3–14. Ms. Rodriguez is a United States citizen. *Id*. Ms. Rodriguez testified that at the checkpoint the shuttle pulled in, and the passengers were instructed by Agent Salcedo to exit the vehicle and have their identifications present. *Id*. at 58:20–59:12. Ms. Rodriguez further testified that the passengers were instructed to go sit down on the bench under the tent. *Id.*

Ms. Rodriguez testified that she and Agent Salcedo made eye contact when Agent Salcedo stepped onto the bus, and instructed the passengers to exit the vehicle. *Id.* at 59:19–22. Ms. Rodriguez further testified that once she exited the shuttle, she began following the rest of the passengers toward the bench under the tent. Hr'g Tr. 5/1/2018 (Doc. 42) at 59:23–60:4. Ms. Rodriguez stated that Agent Salcedo asked her for identification, and Ms. Rodriguez walked toward Agent Salcedo providing a driver's license. *Id.* at 60:2–12, 66:14–67:4, 70:20–24. Ms. Rodriguez testified that Agent Salcedo asked if she was a United States citizen, and Ms. Rodriguez responded

affirmatively. *Id.* Ms. Rodriguez further testified that Agent Salcedo stated that Ms. Rodriguez did not look anything like the driver's license picture. *Id.* at 60:13–16, 66:14–67:4. Ms. Rodriguez gave Agent Salcedo her passport, and testified that Agent Salcedo stated that Ms. Rodriguez "still [did not] look like the person in the picture." *Id.* at 60:17–21, 70:20–24. Ms. Rodriguez testified that she began taking out her social security card, bus card, and Arizona medical card, and began showing them to Agent Salcedo. Hr'g Tr. 5/1/2018 (Doc. 42) at 60:17–61:9, 70:25–71:6. Ms. Rodriguez further testified that she got upset when Agent Salcedo told her that she did not look like the photographs on her identification. *Id.* at 63:4–9, 67:21–68:1. Ms. Rodriguez stated that she was not feeling well at the time of the stop. *Id.* at 62:12–63:3.

Ms. Rodriguez also testified that Agent Salcedo asked if she could speak to her, leading Ms. Rodriguez to the shed, but did not ask for consent to search. *Id.* at 63:23–64:12, 68:5–69:12. Ms. Rodriguez testified that there was no preliminary discussion prior to the search, and that Agent Salcedo's partner, a male agent, followed them to the shed and threatened to use his taser on Ms. Rodriguez if she did not cooperate. *Id.* at 64:13–65:1. Ms. Rodriguez asserted that she did not consent to the search, and that Agent Salcedo told her to put her hands behind her head and spread her legs approximately three (3) times. Hr'g Tr. 5/1/2018 (Doc. 42) at 69:15–18. Ms. Rodriguez further testified that Agent Salcedo patted her down continuously "four or five times." *Id.* at 65:3–13, 69:19–21. Ms. Rodriguez estimated that the search took ten (10) minutes. *Id.* at 65:14–20, 69:19–21. Ms. Rodriguez testified that Agent Salcedo repeatedly asked her if she was going to find anything, and Ms. Rodriguez kept answer "no." *Id.* at 65:21–25. Ms. Rodriguez further testified that Agent Salcedo became frustrated, and lifted the wires to Ms. Rodriguez's bra, causing the package to fall out. *Id.* at 66:1–4, 69:24–70:1.

## II. ANALYSIS

Defendant contests the agent's legal right to conduct any more than an immigration search. *See* Def.'s Mot. to Suppress Evid. (Doc. 29) at 4–6.

## A. *Referral to Secondary at Immigration Checkpoint*

### 1. Checkpoints—In general

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). "[C]heckpoint stops are 'seizures' within the meaning of the Fourth Amendment." *Martinez-Fuerte v. United States*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976). The Supreme Court of the United States has "upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, . . . and at a sobriety checkpoint aimed at removing drunk drivers from the road[.]" *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 452, 148 L.Ed.2d 333 (2000) (internal citations omitted). Such programs were "designed to serve 'special needs, beyond the normal need for law enforcement.'" *Id.* (citations omitted). Moreover, "[i]t has been a national policy for many years to limit immigration into the United States." *Martinez-Fuerte*, 428 U.S. at 551, 96 S.Ct. at 3080. There is a substantial public interest "in the practice of routine stops for inquiry at permanent checkpoints." *Id.* at 556, 96 S.Ct. at 3082.

"While the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited." *Id.* at 558, 96 S.Ct. at 3083. The severity of the interference with individual liberty "is 'gauged by the objective intrusion, measured by the duration of the seizure and the intensity of the investigation, and by the subjective intrusion measured by the fear and surprise engendered in law-abiding motorists by the nature of the stop." *United States v. Fraire*, 575 F.3d 929, 934 (9th Cir. 2009) (citations omitted). "Such a stop is reasonable per se, so long as the scope of the detention remains confined to a few brief questions, the possible production of a document indicating the detainee's lawful presence in the United States, and a 'visual

- 9 -

inspection of the vehicle . . . limited to what can be seen without a search.'" *United States v. Taylor*, 934 F.2d 218, 220 (9th Cir. 1991) (quoting *Martinez-Fuerte*, 428 U.S. at 558, 562, 96 S.Ct. at 3083, 3085).

## **2. Checkpoints—Constitutionality**

The Ninth Circuit Court of Appeals has delineated a "two-step analysis applicable to Fourth Amendment checkpoint cases." *United States v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009). "First, the court must 'determine whether the primary purpose of the [checkpoint] was to advance 'the general interest in crime control.''" *Id.* (citations omitted) (alterations in original). Second, "[i]f the checkpoint is not per se invalid as a crime control device, then the court must 'judge [the checkpoint's] reasonableness, hence its constitutionality on the basis of the individual circumstances.'" *Id.* (citations omitted) (alterations in original). "This requires consideration of 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.* (citations omitted). The Ninth Circuit Court of Appeals has also observed that "a lawful immigration checkpoint is not made unlawful by the addition of a secondary purpose of drug interdiction." *United States v. Wilson*, 650 Fed. Appx. 538 (9th Cir. 2016) (citing *United States v. Soto-Camacho*, 58 F.3d 408, 411–12 (9th Cir. 1995)).

Here, the permanent immigration checkpoint on I-19 is not a general crimes checkpoint, and therefore is not *per se* unreasonable. Furthermore, "[i]t has been a national policy for many years to limit immigration into the United States." *Martinez-Fuerte*, 428 U.S. at 551, 96 S.Ct. at 3080. There is a substantial public interest "in the practice of routine stops for inquiry at permanent checkpoints." *Id.* at 556, 96 S.Ct. at 3082. Agent Salcedo's initial questioning was regarding Defendant Rodriguez's immigration status. Hr'g Tr. 5/1/2018 (Doc. 42) at 17:13–21:16, 40:24–41:14, 41:19–42:4, 54:6–22. While performing this immigration inspection, Agent Salcedo developed a suspicion that Ms. Rodriguez might be involved in criminal activity. *See id.* at 16:17–24:15, 40:24–41:14, 41:19–42:4, 51:14–52:10, 53:8-19, 54:6–22.

- 10 -

### *C. Search of Defendant*

It is well settled law "that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973). "[T]he Fourth and Fourteenth amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.* at 228, 93 S.Ct. at 2048.

"Whether consent to search was voluntarily given is 'to be determined from the totality of all the circumstances.'" *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2041). "[F]ive factors are to be considered in determining the voluntariness of consent to a search[;]" however, these factors are guideposts, and should not be considered a checklist for the Court's review. *Patayan Soriano*, 361 F.3d at 502. The five factors are as follows: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Patayan Soriano*, 361 F.3d at 502 (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)). "The fact that some of these factors are not established does not automatically mean that consent was not voluntary." *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988). The Government bears "the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. State of North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

The Court finds that based upon the totality of the circumstances, Defendant Rodriguez consented to the search of her person. The Court finds Agent Salcedo's testimony regarding the events leading up to and including the search more credible. The Court further finds Agent Salcedo's testimony sought and obtained Defendant

Rodriguez's consent prior to the search credible. The Court also finds that there is no evidence that Defendant Rodriguez was threatened, coerced or that her will was overborne. Moreover, the Court finds that Defendant Rodriguez did not revoke her consent at any time during her interactions with Agent Salcedo. As such, the Court finds that Defendant Rodriguez freely and voluntarily gave her consent for law enforcement to perform a pat-down search of her person.

## IV. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Judge, after his independent review, DENY Defendant Iris Rodriguez's Motion to Suppress Evidence (Doc. 29).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR-17-1301-TUC-JAS**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

Dated this 2nd day of July, 2018.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge